Slip Op. 18-45
**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| VULCAN THREADED PRODUCTS INC., <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> JIAXING BROTHER FASTENER CO., LTD., IFI & MORGAN Ltd., RMB FASTENERS LTD., and ZHEIJANG NEW ORIENTAL FASTENERS CO., LTD., <br><br> Defendant-Intervenors. | Before: Judge Gary S. Katzmann <br><br> Court No. 16-00268 |

**OPINION**

[Plaintiff's Motion for Judgment on the Agency Record in Commerce antidumping administrative review proceeding is denied.]

Dated: April 18, 2018

Elizabeth Drake, Schagrin Associates, of Washington, DC, argued for plaintiff. With her on the brief were Robert B. Schagrin and Christopher T. Cloutier.

L. Misha Preheim, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant. With him on the brief were Chad A. Readler, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director, and Elizabeth Anne Speck, Senior Trial Counsel. Of counsel on the brief was Khalil N. Gharbieh, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

Gregory S. Menegaz, DeKieffer & Horgan, PLLC, of Washington, DC, argued for defendant-intervenors, Jiaxing Brother Fastener Co., Ltd., IFI & Morgan Ltd., and RMB Fasteners Ltd. With him on the brief were J. Kevin Hogan and Alexandra H. Salzman.

Peter J. Koenig, Squire Patton Boggs LLP, of Washington, DC, for defendant-intervenor, Zhejiang New Oriental Fasteners Co., Ltd.

Katzmann, Judge: What are the limits of agency discretion when evaluating which information to use from an imperfect swirl of economic data? More specifically, did the Department of Commerce ("Commerce") choose the "best available information" in this case to calculate what it effectively cost to produce steel threaded rod in China in order to determine whether Chinese manufacturers are "dumping" their products in the United States at below market prices?

Plaintiff Vulcan Threaded Products, Inc. ("Vulcan") alleges that Commerce chose wrongly, and challenges Commerce's determination that the Bulgarian data was the "best available information" to use in the final results and amended final results of the 2014–15 administrative review of the antidumping duty order on certain steel threaded rod from China. See Steel Threaded Rod from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2014–15, 81 Fed. Reg. 83,800 (Dep't Commerce Nov. 22, 2016) ("Final Results"), and accompanying Issues and Decision Memorandum ("IDM"), P.R. 179, amended by Steel Threaded Rod from the People's Republic of China: Amended Final Results of Antidumping Duty Administrative Review; 2014–15, 82 Fed. Reg. 1698 (Dep't Commerce Jan. 6, 2017). Vulcan argues that a number of legal and factual determinations in the Final Results, in which Commerce selected Bulgaria as the surrogate country for the calculation of the normal value, are unsupported by substantial evidence on the record pursuant to Section 516A(b)(1)(A) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(b)(1)(A).[1] Compl., Jan. 17, 2017, ECF No. 8; Pl.'s Mot. For J. on the Agency R. and Br. in Supp., July 19, 2017, ECF No. 36 ("Pl.'s Br."); Pl.'s Reply, Nov. 6, 2017, ECF No. 44. Vulcan thus seeks remand. Compl. at 1. Defendant the United States ("the

---

[1] Further citations to the Tariff Act of 1930 are to the relevant portions of Title 19 of the U.S. Code, 2012 edition.

Government") and defendant-intervenors RMB Fasteners Ltd., IFI & Morgan Ltd., and Jiaxing Brother Standard Part Co., Ltd. ("RMB/IFI Group") oppose Vulcan's motion. Def.'s Opp'n, Sept. 18, 2017, ECF No. 39 ("Def.'s Br."); Def.-Inter.'s Opp'n, Oct. 10, 2017, ECF No. 43 ("Def.-Inter.'s Br.").

The court concludes that Commerce's decision to use the Bulgarian data was reasonable and supported by substantial evidence on the record, and thus sustains the Final Results.

**BACKGROUND**

A.  **Legal and Regulatory Framework of Antidumping Reviews Generally.**

Dumping occurs when a foreign company sells a product in the United States for less than fair value -- that is, for a lower price than in its home market. Huzhou Muyun Wood Co., Ltd. v. United States, 42 CIT ___, ___, 279 F. Supp. 3d 1215, 1218 (2017) (citing Sioux Honey Ass'n v. Hartford Fire Ins. Co., 672 F.3d 1041, 1046 (Fed. Cir. 2012)). To empower Commerce to offset economic distortions caused by dumping, Congress enacted the Tariff Act of 1930. Id. Under the Tariff Act's framework, Commerce may -- either at the request of a domestic producer or of its own initiative -- begin an investigation into potential dumping and, if appropriate, issue an anti-dumping order imposing duties on the subject merchandise. Id.

When Commerce conducts an antidumping review, it first determines the normal value for the subject merchandise in order to compare it to the actual export price. 19 U.S.C. § 1677b(a) (2012). Commerce traditionally determines normal value by reference to market prices in the exporting country. Id. § 1677b(a)(1). However, when the subject merchandise is produced in a non-market economy, Commerce must "determine the normal value of the subject merchandise on the basis of the value of the factors of production [("FOPs")] utilized in producing the merchandise." Id. § 1677b(c)(1). Commerce is required to value FOPs, to the extent possible, by

identifying one or more market economy countries that are (A) "at a level of economic development comparable to that of the nonmarket country" and (B) "significant producers of comparable merchandise." Id. § 1677b(c)(4)(A–B); Dorbest Ltd. v. United States, 604 F.3d 1363, 1372 (Fed. Cir. 2010). Commerce prefers to draw FOP data from a single surrogate country when possible. 19 C.F.R. § 351.508(c)(2). If several potential surrogates are available, Commerce evaluates the reliability and completeness of the data in the similarly-situated surrogate countries and generally selects the one with the best data as the primary surrogate country. Jiaxing Bro. Fastener Co. v. United States, 822 F.3d 1289, 1294 (Fed. Cir. 2016).

Although Commerce is required to value FOPs using the "best available information," Commerce has discretion to determine what constitutes the best available information. Id. at 1293. In evaluating the reliability and completeness of the data, Commerce's practice is to "use investigation or review period-wide price averages, prices specific to the input in question, prices that are net of taxes and import duties, prices that are contemporaneous with the period of investigation or review, and publicly available data." Import Admin., U.S. Dep't Commerce, Non–Market Economy Surrogate Country Selection Process, Policy Bulletin 04.1 (2004), https://enforcement.trade.gov/policy/bull04-1.html (last visited Feb. 6, 2018). This evaluation is a context-specific, industry-specific, and fact-intensive inquiry; as such, "Commerce is required to base surrogate country selection on the facts presented in each case, and not on grounds of perceived tradition. Each administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record." Jiaxing, 822 F.3d at 1299 (internal quotation marks omitted).

B.     **Factual and Procedural History of this Case.**

In 2009, Commerce issued an antidumping order covering certain steel threaded rod from China. Certain Steel Threaded Rod from the People's Republic of China, 74 Fed. Reg. 17,154 (Dep't Commerce Apr. 14, 2009). Steel threaded rod is made by taking steel rod, bar, or studs that have a solid, circular cross section and applying threaded grooves around the outside. IDM at 1. In April of 2014, Vulcan requested that Commerce conduct an administrative review of the antidumping order. Letter from Vorys, Sater, Seymour and Pease LLP to U.S. Department of Commerce (Apr. 30, 2015), P.R. 3. In May 2015, Commerce initiated the administrative review. Initiation of Antidumping and Countervailing Duty Administrative Reviews, 80 Fed. Reg. 30,041, 30,046–47 (Dep't Commerce May 26, 2015). Commerce selected Zhejiang New Oriental Fastener Co., Ltd. ("New Oriental") and RMB/IFI Group as mandatory respondents. Certain Steel Threaded Rod from the People's Republic of China, 81 Fed. Reg. 29,843 (Dep't Commerce May 13, 2016) ("Preliminary Results"), and accompanying Preliminary Decision Memorandum ("PDM"), P.R. 155.

Because this review concerned exports from China, a country that Commerce treats as a non-market economy, Commerce sought a surrogate market economy in which to value the factors of production for steel threaded rod. PDM at 6. Commerce determined that Bulgaria, Ecuador, Mexico, Romania, South Africa, and Thailand were countries at China's level of economic development based upon their per capita gross national income, as reported by the World Bank. 81 Fed. Reg. 29,843; PDM at 6–7. Vulcan submitted surrogate value information from Thailand, while both RMB/IFI and New Oriental submitted surrogate value data from Bulgaria. PDM at 6–7; Letter from Vorys, Sater, Seymour and Pease LLP to U.S. Department of Commerce (Dec. 7, 2015), P.R. 81–85; Letter from deKieffer & Horgan, PLCC to U.S. Department of Commerce

(Dec. 7, 2015), P.R. 88–89; Letter from Squire Patton Boggs to U.S. Department of Commerce (Dec. 7, 2015), P.R. 86–87.

After evaluating the data submitted by the parties, Commerce preliminarily determined that Bulgaria provided the best available information for surrogate valuation purposes. PDM at 9. Commerce explained that steel inputs were of "overwhelming importance" in the calculation of the normal value. Id. Therefore, because (1) the Bulgarian data for steel wire rod covered the full range of diameters used by the parties, (2) the parties used significantly more wire rod than round bar, and (3) the carbon content was functionally equivalent between the two datasets, the Bulgarian data were the closest match to the parties' FOPs. PDM at 8–9.

In June 2016, Vulcan submitted an administrative case brief arguing that Commerce should use Thailand instead of Bulgaria as the surrogate market economy for China in the final results. Case Brief of Petitioner Vulcan Threaded Products, Inc., appended to Letter from Vorys, Sater, Seymour and Pease LLP to U.S. Department of Commerce (June 20, 2016), P.R. 164. Commerce selected Bulgaria as the surrogate market economy in the Final Results issued in November 2016, and Vulcan challenged this determination the following month. IDM at 8; Summons, Dec. 21, 2016, ECF No. 1; Compl. This court authorized the participation of RMB/IFI as defendant-intervenors. Order, Feb. 22, 2017, ECF No. 22.

On July 19, 2017, Vulcan submitted its Motion for Judgment on the Agency Record and Brief in Support. Pl.'s Br. The Government and defendant-intervenors submitted their briefs in opposition on September 18, 2017 and October 10, 2017, respectively. Def.'s Br.; Def.-Inter.'s Br. Vulcan replied on November 6, 2017. Pl's Reply. Oral arguments were heard by this court on February 8, 2018. ECF No. 51. Vulcan and defendant-intervenors filed supplemental authority on February 13, 2018. ECF No. 52; ECF No. 53.

**JURISDICTION AND STANDARD OF REVIEW**

This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2)(B)(iii).  When reviewing anti-dumping and countervailing duty determinations, the court must sustain Commerce's determinations in administrative reviews unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with the law." 19 U.S.C. § 1516a(b)(1)(B)(i).

**DISCUSSION**

Based on the record as a whole, the court is not persuaded that Vulcan's disagreements with how Commerce evaluated the data in this case render Commerce's decision unsupported by substantial evidence.

A. **Commerce's Finding that Bulgarian Data Was More Specific with Regard to Diameter Was Reasonable and Supported by Substantial Evidence on the Record.**

Vulcan contends that it provided, and Commerce ignored, evidence that no reasonable person would find the Bulgarian information superior on the basis of the steel wire rod diameter data.  Pl.'s Br. at 9–10.  Commerce selected the Bulgarian data, in part, because they were more specific with regard to diameter for steel wire rod.  Specifically, the Bulgarian Harmonized Tariff Schedule ("HTS") had a separate breakout for wire rod between 14 and 32mm, whereas the Thai HTS only covered the lower range of steel wire rod diameters.  IDM at 8.  Vulcan, however, argues that the "paucity" of imports of steel wire rod with diameters of 14mm and greater to Bulgaria invalidates Commerce's rationale for selecting the Bulgarian data.[2]  According to the HTS, the

---

[2] Vulcan also contends that carbon content is more important than wire rod diameter, and thus Commerce's decision to use the Bulgarian data on the basis of wire rod diameter specificity was not supported by substantial evidence.  See Vulcan's Suppl. Authority at 2–3.  Vulcan relies, in part, on a recent decision of this court upholding Commerce's determination, following remand, that carbon content was a more important factor than diameter in evaluating the specificity of wire

Bulgarian data were based on 1,147 tons of wire rod with a diameter of 14mm or greater in 2014 and 160 tons in 2015. Letter from Squire Patton Boggs to U.S. Department of Commerce (Dec. 7, 2015), P.R. 86–87, at Exhibit SV-4b ("Bulgaria GTA Values").

Vulcan's interpretation of the diameter data does not render Commerce's decision on this issue unsupported by substantial evidence. Substantial evidence is "more than a mere scintilla" and amounts to what a "reasonable mind might accept as adequate to support a conclusion." Downhole Pipe & Equip., L.P. v. United States, 776 F.3d 1369, 1374 (Fed. Cir. 2015) (quoting Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229 (1938)). Review is limited to the record before Commerce in the particular administrative review proceeding at issue and includes all "evidence that supports and detracts" from Commerce's conclusion. Sango Int'l L.P. v. United States, 567 F.3d 1356, 1362 (Fed. Cir. 2009). Importantly, an agency finding may still be supported by substantial evidence even if two inconsistent conclusions can be drawn from the evidence. Downhole, 776 F.3d at 1374 (citing Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966)).

In evaluating Commerce's selection of the best available surrogate value under the substantial evidence standard, "[t]he Court's role is not to make that determination anew, but rather to decide 'whether a reasonable mind could conclude that Commerce chose the best available information.'" China First Pencil Co. v. United States, 34 CIT 1284, 1290, 721 F. Supp. 2d 1369

---

rod data, Itochu Bldg. Prods. Co. v. United States, 43 CIT ___, Slip op. 18-3 (January 18, 2018) (Not reported in F. Supp. 3d). However, that case is distinguishable, as it involved a different kind of subject merchandise with different production input experiences and a different record before Commerce, and thus its holding is not determinative of the instant case. Goldlink Indus. Co. v. United States, 30 CIT 616, 619, 431 F. Supp. 2d 1323, 1327 (2006). Moreover, Commerce determined that the two data sets in question here were "roughly equal" in terms of carbon content -- a determination made with substantial support in the record, as discussed infra -- and thus the relative importance of wire rod diameter and carbon content have no bearing on the outcome of this case.

(2010) (quoting QVD Food Co. v. United States, 34 CIT 1166, 1169, 721 F. Supp. 2d 1311 (2010), aff'd, 658 F.3d 1318 (Fed. Cir. 2011)).  Further, because the governing statute fails to define "best available information," Commerce has "broad discretion to determine the 'best available information' in a reasonable manner on a case-by-case basis."  Goldlink Indus. Co. v. United States, 30 CIT 616, 619, 431 F. Supp. 2d 1323, 1327 (2006) (quoting Timken Co. v. United States, 25 CIT 939, 944, 166 F. Supp. 2d 608, 616 (2001)).

Here, Commerce's decision to use the Bulgarian data was supported by substantial evidence.  Commerce noted that "both respondents consumed significantly more wire rod than round bar," and that it therefore chose to prioritize the quality of wire rod data when choosing whether to use the Thai or Bulgarian information.  IDM at 6–8.  The Bulgarian set contained some data for wire rod with diameters of 14mm or larger, while the Thai set contained no information pertaining to wire rod with this diameter.  Vulcan contends that the sample size for the Bulgarian wire rod above 14mm in diameter is too small, but does not contend that this wire rod was not sold at market-based prices or that the inclusion of this data is otherwise distortive.  Further, the record does not support a conclusion that this wire rod data undermined the accuracy of Commerce's calculations.  For these reasons, Commerce's decision to use the Bulgarian dataset that included better coverage of larger diameter inputs was reasonable and supported by substantial evidence.

Vulcan's contention that "Commerce improperly failed to 'take into account whatever in the record fairly detracts from its weight'" is also unavailing.  Pl.'s Br. at 11 (citing Gerald Metals, Inc. v. United States, 132 F.3d 716, 720 (Fed. Cir. 1997)).  Vulcan is correct that Commerce did not specifically respond to Vulcan's concern regarding volume in the text of the IDM.  However, "Courts look for a reasoned analysis or explanation for an agency's decision as a way to determine whether a particular decision is arbitrary, capricious, or an abuse of discretion.  An explicit

explanation is not necessary, however, where the agency's decisional path is reasonably discernible." Wheatland Tube Co. v. United States, 161 F.3d 1365, 1369–70 (Fed. Cir. 1998) (internal citations removed) (citing Ceramica Regiomontana, S.A. v. United States, 810 F.2d 1137, 1139 (Fed. Cir. 1987)). Here, Commerce provided substantial explanations in the IDM for weighing the data as it has. The agency's decisional path is reasonably discernable and, as discussed above, supported by substantial evidence on the record.

B.  **Commerce's Finding that Bulgarian and Thai Data Were Roughly Equivalent with Respect to Carbon Content Was Reasonable and Supported by Substantial Evidence on the Record.**

Vulcan argues that the data contained in the Bulgarian HTS for steel wire rod between 14 and 32 mm was based on such a small sample so as to be meaningless, and thus the "clear superiority of Thai wire rod data in terms of carbon content" warrants the selection of Thailand rather than Bulgaria as the surrogate. Pl.'s Br. at 12. Vulcan asserts that the Thai data are superior because they are more specific with regard to the covered range. Or. Arg. Vulcan notes that the Bulgarian data include steel wire rod with a carbon content of less than 0.25 percent whereas the Thai data only includes steel wire rod with a carbon content of 0.23 percent or less. Pl.'s Br. at 12; Letter from Vorys, Sater, Seymour and Pease to U.S. Department of Commerce (Dec. 7, 2015), P.R. 81–85, at Exhibit 1 ("Thailand Surrogate Value Summary"); Bulgaria GTA. That is, the Bulgarian data include steel wire rod with a carbon content of 0.24 percent, equating to one one-hundredth of a percent more coverage than the Thai data. Pl.'s Br. at 12; Thailand Surrogate Value Summary; Bulgaria GTA. However, Vulcan points to nothing in the record that would indicate that the inclusion of steel imports with a carbon content of 0.24 percent would affect the accuracy of Commerce's calculations. Therefore, Commerce's decision that the Bulgarian and Thai were

"roughly equal" was reasonable and supported by substantial evidence in the record of this case. IDM at 7; Def.-Inter.'s Br. at 4.

In its brief, Vulcan additionally notes that "the Bulgarian HTS identifies carbon content of imported wire rod based only on three ranges […]. By contrast, the Thai HTS identifies twice as many different carbon content levels for imported wire rod." Pl.'s Br. at 12. Vulcan contends that "Commerce cannot reasonably equate the six distinct carbon content ranges in the Thai HTS with the three in the Bulgarian HTS, for reasons recently articulated by this Court." Pl.'s Br. at 15 (citing Itochu Bldg. Prods. Co. v. United States, 42 CIT ___, Slip op. 17-66 (June 5, 2017)). Thus, according to Vulcan, the greater specificity of the Thai HTS with respect to carbon content renders the Thai data superior with respect to carbon content. Pl.'s Br. at 15.

At Oral Argument, Vulcan acknowledged that the greater specificity with regard to the HTS breakouts was effectively meaningless. Or. Arg. Indeed, the court also finds this specificity argument unpersuasive. Neither mandatory respondent specified the carbon content of inputs below certain percentages, and so further categorization below that threshold in the Thai data could reasonably be viewed as irrelevant to Commerce's calculations. See IDM at 7. Further, Commerce averaged the data contained within the more specific breakouts to make a single wire rod surrogate value, essentially neutralizing any potential effect of the more specific categories. See Surrogate Values for the Preliminary Results, P.R. 157, (May 5, 2016), at 3; Surrogate Values for the Final Results, P.R. 182, (Nov. 14, 2016), at 1 (indicating that Commerce used the same surrogate value data as the Preliminary Results unless otherwise stated). Therefore, Commerce's determination that the Thai and Bulgarian data were equally specific for purposes of its calculations in this case was supported by substantial evidence.

C.     **Commerce's Decision to Give Greater Weight to Steel Wire Rod Was Reasonable and Supported by Substantial Evidence on the Record.**

Vulcan contends that although the Bulgarian HTS has more specific entries as to diameter of steel wire rod, the Thai HTS has more specific entries as to the diameter of round bar. Pl.'s Br. at 15. Specifically, "the Thai HTS has four times as many codes, covering round bar to a much greater specificity [than the Bulgarian HTS]." Pl.'s Br. at 15; Thailand Surrogate Value Summary; Bulgaria GTA. While Commerce supported its decision by stating that the respondents consumed more wire rod than round bar, Vulcan argues that "the different FOP consumption amounts between wire rod and round bar should not allow Commerce to select Bulgaria based on a FOP-specific justification that is completely contradicted for the other FOP." Pl.'s Br. at 16.

However, Commerce is allowed to prioritize FOPs that have a greater impact on production costs, and the surveyed manufacturers reported using significantly more wire rod than round bar. Jiaxing, 822 F.3d at 1301 (holding that "Commerce's decision to emphasize the steel input was reasonable and supported by substantial evidence" because "steel is the main input and primary driver of cost for steel threaded rod"); IDM at 8. Vulcan does not dispute that more wire rod than round bar was consumed. While the Thai data for round bar with diameters of 14mm and greater is more specific than the Bulgarian, the Bulgarian data for wire rod with diameters of 14mm and greater is more specific than the Thai. IDM at 7–8. Thus, in light of the greater consumption of wire rod in the production of the subject merchandise, Commerce's decision to use the Bulgarian data was supported by substantial evidence.

D.     **Commerce Is Not Bound by Its Prior Findings that Thai Data Were Superior in Different Circumstances.**

Finally, Vulcan notes that Commerce had selected Thai data in previous administrative reviews. Pl.'s Br. at 6. Vulcan also seems to imply that the fact that Commerce is currently

defending the selection of Thailand as the surrogate market economy for China in other cases before this court is evidence of the superiority of the Thai data. Pl.'s Br. at 7. Therefore, Vulcan intimates, the selection of Thai data is supported by substantial evidence while the use of Bulgarian data is not. However, as the Federal Circuit stated, "Commerce is required to base surrogate country selection on the facts presented in each case, and not on grounds of perceived tradition. Each administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record." Jiaxing, 822 F.3d at 1299 (internal quotation marks omitted); see also Goldlink, 431 F. Supp. 2d at 1327 (quoting Timken Co., 166 F. Supp. 2d at 616) (declaring that, Commerce has "broad discretion to determine the 'best available information' in a reasonable manner on a case-by-case basis"). For the reasons previously discussed, Commerce's decision to use the Bulgarian data was supported by substantial evidence on the record and thus Commerce permissibly selected Bulgaria as the surrogate country in this administrative review.

## CONCLUSION

For the reasons stated above, Commerce's use of the Bulgarian data in this administrative review was supported by substantial evidence. For the foregoing reasons, it is hereby

**ORDERED** that Vulcan's Motion for Judgment on the Agency Record is **DENIED**; and it is further

**ORDERED** that Commerce's Final Results are **SUSTAINED**.

                                          /s/ *Gary S. Katzmann*
                                          Gary S. Katzmann, Judge

Dated: April 18, 2018
      New York, New York